IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| WILLIAMS PATENT CRUSHER AND PULVERIZER CO., INC., | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. |
| CLYDE BERGEMANN POWER GROUP AMERICAS INC., | ) ) ) |
| | ) **JURY TRIAL DEMANDED** |
| Serve at:<br>Clyde Bergemann US Inc.<br>4015 Presidential Parkway<br>Atlanta, GA, 30340 | ) ) ) ) ) ) |
| Defendant. | ) |

## COMPLAINT

COMES NOW Plaintiff WILLIAMS PATENT CRUSHER AND PULVERIZER CO., INC. ("Williams" or "Plaintiff"), by and through undersigned counsel, and for its Complaint against Defendant CLYDE BERGEMANN POWER GROUP AMERICAS INC. ("Defendant" or "CBP"), states as follows:

## PARTIES

1. Williams is a Missouri corporation and has its principal place of business at 2701 North Broadway, St. Louis, Missouri 63102.

2. On information and belief, Defendant is a Delaware corporation with its principal place of business at 4015 Presidential Parkway, Atlanta, Georgia, 30340, and transacts business in this Judicial District.

2289352

## JURISDICTION AND VENUE

3. This Judicial District has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because complete diversity of citizenship exists between Williams and Defendant and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

4. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b)(2) because it is the Judicial District where a substantial part of the events or omissions giving rise to the claim occurred.

5. Defendant is subject to personal jurisdiction in this District under Missouri's Long Arm Statute, providing that a person is subject to jurisdiction in Missouri for any cause of action arising from the making of a contract within Missouri. Mo. Rev. Stat. § 506.500.1(2). As set forth herein, the contract between Defendant and Williams upon which this cause of action is based was made in Missouri.

## FACTS

6. In or around October 2011, Williams received specifications from KHD Humboldt-Wedag, Inc. ("KHD") relating to the operation of a Williams DF 100 Roller Mill and Classifier to be installed at a cement plant owned by Lafarge Building Materials, Inc. ("Lafarge") located in Ravena, New York.

7. In accordance with the Lafarge and KHD specifications, Williams submitted a proposal offering to sell to KHD the Williams DF-100 Roller Mill and Classifier and the proposal was accepted by KHD. A copy of the "as sold" proposal is attached as Exhibit A.

8. The Williams proposal included a rotary valve feeder to isolate the material and provide an air seal to maintain a vacuum while the material is being fed into and through the Roller Mill and Classifier.

9. Lafarge and KHD had specified that the Roller Mill and Classifier would be fed coke, coal or a mixture thereof at particular size and moisture content.

10. When the Williams DF-100 Roller Mill and Classifier is properly fed coke, coal, or a mixture thereof, it will roll and dry the raw material, producing a consistently fine particulate product that can then be used to fuel the cement plant.

11. After KHD accepted Williams' offer, Williams sought to purchase a rotary valve that was suitable for the expressed operation and could handle material identified in the Lafarge and KHD specification.

12. Williams considered several different manufacturers of rotary valves and reviewed the representations made by Defendant in Case Study materials and on Defendant's website.

13. Williams contacted Defendant's local sales representative with Rhodes Equipment located at 5922 Hampton Avenue, St. Louis, Missouri, and received an offer from Defendant on or about February 12, 2012 for its 18" PERMA/flo, XL Severe Duty Rotary Valve ("Rotary Valve") for a total purchase price of $37,100.00, including a Rotor Pocket Purge Kit for sticky products such as a coke/coal blend.

14. In reliance upon the statements and representations made by Defendant, including statements of its history and experience, and its capabilities of handling the materials based upon the specifications provided by Lafarge, Williams accepted Defendant's offer and agreed to purchase the Rotary Valve from Defendant.

15. The Lafarge cement plant project was temporarily delayed, and on or about May 28, 2013, Williams received a revised offer from Defendant for its 18" PERMA/flo, Type "XL," Severe Duty Rotary Valve for a total purchase price of $43,447, including the purchase of

3

Defendants' recommended Pocket Purge kit to prevent plugging. A true, correct copy of the quotation is attached hereto as Exhibit B.

16. On May 12, 2014, Williams sent Purchase Order P14-000634 (the "Purchase Order") to Defendant, ordering the Rotary Valve at a purchase price of $43,447.00. A true and correct copy of the Purchase Order is attached hereto as Exhibit C.

17. Among other things, the Purchase Order specified that Defendant's Rotary Valve must be able to perform with "Minus 2" Petroleum Coke at Moisture Content of 8% at 66,622 PPH" and with "Minus 2" Coal at Moisture Content of 15% at 87,560 PPH" at an operating temperature of between 60-250 degrees Fahrenheit.

18. The Purchase Order further specified that the Rotary Valve should be shipped to William's plant in Missouri, but should be marked "KHD Humboldt Wedag DF-100 Roller Mill."

19. Under the terms of the Purchase Order, 50% of the purchase price was due upon submittal of approval drawings, with the remaining 50% due upon shipment.

20. The Purchase Order contains, in relevant part, the following provisions:

   a. "If seller breaches any of the terms and provisions hereof, or any obligation imposed by Law, Buyer shall have, in addition to any remedies contained herein, such remedies as are provided by law, and without limiting the generality of the foregoing, shall have the right to cancel, cover and recover direct, incidental, special and consequential damages."

   b. "Seller shall defend, indemnify, and hold Buyer harmless from any claims made upon or actions brought against Buyer by an persons whomsoever, which are in any way related to or connected with the material or services which are described on the face hereof, the manufacture, or the use of the same including without limiting

4

the generally [sic] of the foregoing, any claims or actions for . . . property damage direct, special, incidental or consequential damages, . . . whether or not any negligence, act or commission [sic] of Buyer contributed thereto."

21. On or about May 19, 2014, Defendant accepted and signed the Purchase Order and all the terms thereof (with an agreed modification to the warranty term).

22. Williams paid Defendant $43,477 for the Rotary Valve in accordance with the quotation and payment terms of the Purchase Order.

23. In 2017, Defendant's Rotary Valve was installed in the Lafarge Cement Plant, but the Rotary Valve failed to properly function as promised, thereby preventing the operation of Williams' DF-100 Roller Mill and Classifier and impeding the operation of the Lafarge cement plant.

24. Williams' and Defendant's service representatives performed work on the Rotary Valve in an attempt to allow it to function as promised, but the material would continuously plug in the Rotary Valve. In addition, Williams was required to rewire the Rotary Valve, which had been wired incorrectly. Despite making this correction, the Rotary Valve still failed to perform. Williams also coated the rotor with a low stick material, and added deflector plates mounted in the feed chute, and removed the rotary valve deflector per factory recommendations in the presence of Defendant's service representatives. Defendant's service representative indicated that Williams attempted the same trouble-shooting as he would have performed. Nevertheless, these modifications were unsuccessful.

25. Contrary to the representations that the Rotary Valve could handle the materials being fed into it and that the Pocket Purge kit would "prevent plugging of the valve caused by the

high moisture content in the Coke/coal blend," the Rotary Valve completely failed to function as promised.

26. Following the failure of Defendant's Rotary Valve, and based upon Defendant's claims that the coal/coke blend that was being fed into the Rotary Valve appeared "sticky," Williams conducted a composition analysis of the raw material being fed to the DF-100 Roller Mill and Classifier at the Lafarge cement plant. Results showed the moisture content of the material was 6.57%, which is well below the 8% and 15% maximum moisture content specified in the Purchase Order, thereby belying Defendant's claims of overly sticky material causing the failure of its Rotary Valve. A true and correct copy of the Lab Testing Report is attached hereto as Exhibit D.

27. Since the Rotary Valve was unable to adequately perform its function, KHD purchased a rotary valve made by Precision Machine & Manufacturing, Inc. ("PMM Valve") at a cost of $102,943, including freight costs.

28. The PMM Valve replaced the Defendant's Rotary Valve, and with *no other process changes* or modifications of the coal/coke blend being supplied, the new valve performed successfully feeding the coal/coke blend into the DF-100 Roller Mill and Classifier.

29. The Rotary Valve's failure caused monetary damages, including the cost of the PMM Valve, field services costs, delay in production, cost of work on feeders, and the cost of replacing the Rotary Valve.

30. In addition to the cost of (unsuccessful) repair work done on the Rotary Valve, and the cost of purchasing and installing the PMM Valve for $102,943.00, there were additional service and other charges as a result of the faulty Rotary Valve.

31. As a result of Defendant's deficient Rotary Valve and Defendant's misrepresentations about its Rotary Valve, Williams was obligated to pay KHD $183,374.14.

32. Williams demanded that Defendant return the purchase price paid for Defendant's Rotary Valve and reimburse Williams for the costs it was obligated to pay to KHD as a result of Defendant's faulty Rotary Valve, but Defendant has refused and continues to refuse to pay Williams for the damages it has incurred.

## COUNT I: BREACH OF CONTRACT

33. Williams incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

34. The Purchase Order, accepted by Defendant, was at all times relevant hereto and remains a valid contract supported by adequate consideration.

35. Williams has performed its obligations under the Purchase Order by, among other things, paying the full purchase price of $43,447.00 for the Roller Mill Feed Rotary Valve pursuant to the payment terms of the Purchase Order.

36. Williams has further performed its obligations under the Purchase Order by using a coal and coke mixture well below the maximum moisture content specified in the Purchase Order.

37. Defendant breached the terms of the Purchase Order by failing to provide a Rotary Valve that was able to perform with "Minus 2" Petroleum Coke at Moisture Content of 8% at 66,622PPH" and with "Minus 2" Coal at Moisture Content of 15% at 87,560 PPH" at an operating temperature of between 60-250 degrees Fahrenheit.

38. Defendant's breach caused Williams to sustain damages in excess of $226,794.14.

39. Defendant has further breached the terms of the Purchase Order by failing to indemnify Williams for the claims made by KHD based on the faulty Rotary Valve.

40. As a result of Defendant's breach of contract, Williams has sustained damages in excess of $226,794.14.

## COUNT II: BREACH OF IMPLIED WARRANTY OF FITNESS

41. Williams incorporates by reference the allegations in the foregoing paragraphs as though fully set forth herein.

42. Pursuant to the Uniform Commercial Code § 2-315, as adopted by the state of Missouri, Defendant's sale of the Rotary Valve was accompanied by an implied warranty fitness for the particular purposes of KHD and Lafarge.  *See* § 400.2-315 R.S.Mo.

43. Defendant's implied warranty of fitness warrants that the Rotary Valve is fit and sufficient for its intended and particular purpose.

44. Prior to entering into an agreement to purchase Defendant's Rotary Valve, Defendant held itself out as one of the leaders in the material handling field with hundreds of installations and over 70 years of experience and represented that its Rotary Valve would be able to serve the functions necessary for the Williams Roller Mill and Classifier based upon the specifications provided by KHD and Lafarge.

45. Defendant breached its implied warranty of fitness by selling a Rotary Valve that was inadequate for its particular purpose and failed to meet the requirements for its foreseeable use.

46. To remedy Defendant's breach, Williams has been required to expend resources and incur significant costs.

47. As a direct and proximate result of Defendant's material breach of the implied warranty of fitness, Williams has been damaged in an amount in excess of $226,794.14.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and against Defendant in an amount to be determined at trial, for its costs of bringing this action and reasonable attorneys' fees, and for any other and further relief as this Court deems just and proper.

Respectfully submitted,

**LEWIS RICE LLC**

By: /s/ John M. Hessel
John M. Hessel, #26408MO
Sarah A. Milunski, #65112MO
600 Washington Avenue, Suite 2500
St. Louis, Missouri 63101
Telephone:  314-444-7600
Fax:  314-241-6056
Email: jhessel@lewisrice.com
smilunski@lewisrice.com

*Attorneys for Plaintiff Williams Patent Crusher and Pulverizer Co., Inc.*